2000 SD 2

**James H. MEINDERS, Petitioner and Appellant,**

v.

**Douglas WEBER, Warden of the South Dakota Penitentiary, Appellee.**

No. 20689.

Supreme Court of South Dakota.

Argued June 2, 1999.

Reassigned Aug. 11, 1999.

Decided Jan. 5, 2000.

Lisa Hansen Marso of Boyce, Murphy, McDowell & Greenfield, L.L.P., Sioux Falls, South Dakota, Attorneys for petitioner and appellant.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee.

KONENKAMP, Justice (on reassignment).

[¶ 1.] James Meinders appeals the denial of habeas corpus relief, asserting that (1) South Dakota's sex offender registration statutes violate the ex post facto clauses of both our state and federal constitutions and constitute cruel and unusual punishment when retroactively applied to him; (2) the amended good time statutes (SDCL 24–2–12 and 24–2–18) violate the ex post facto clauses of both the state and federal constitutions; (3) his fifth amendment right against self-incrimination was violated by the state penitentiary's sex offender treatment program requirement that he admit his sex offense; and (4) his trial attorney was ineffective. We affirm on all issues.

### Facts

[¶ 2.] When they met in early 1989, A.G. was fourteen years old, and Meinders was

nineteen. She told him her age, explaining that she had been attending junior high school, but "just quit." A.G. was a troubled adolescent. She was not getting along with her parents. She later said she knew Meinders was nineteen, but misled her parents about his age. Her parents had already expressed concern about her relationship with him. She knew they would disapprove if they knew his real age. In March 1989, Meinders and A.G. began having sexual intercourse. A.G. turned fifteen on March 20, 1989.

[¶ 3.] In April 1989, A.G. ran away. Police found her and Meinders in Watertown, South Dakota. She returned home, promising her parents she would have no contact with Meinders. But she continued to see him nonetheless when her parents were not home. A.G. ran away again in June to live with Meinders and his parents. She and Meinders had separate bedrooms, but they continued their sexual activities while his parents were at work or sleeping. A.G. did not contact her parents until mid-August. Finally, she called her mother to say that Meinders had hit her. She wanted to come home. Her mother arrived at Meinders' home accompanied by the police. A.G. then told the authorities about her sex acts with Meinders.

[¶ 4.] Meinders was indicted for statutory rape (SDCL 22–22–1(5)) and sexual contact (SDCL 22–22–7).[1] In July 1990, a jury convicted him of statutory rape. He was sentenced to fifteen years in the penitentiary with twelve years suspended. After serving two and a half years, he was released. Approximately twenty months later, he was returned to the penitentiary after being convicted of grand theft. The suspended portion of his fifteen-year sentence was revoked. Meinders petitioned for a writ of habeas corpus relief. The habeas court denied his petition and he appeals.

[¶ 5.] Habeas corpus applicants bear the initial burden of proof to establish a colorable claim for relief. *Jenner v. Dooley*, 1999 SD 20, ¶ 11, 590 N.W.2d 463, 468. These proceedings are no substitute for direct appeal: as a collateral attack on a final judgment, the remedy is limited. *Id.* We review habeas factual findings under the clearly erroneous standard and legal conclusions under the de novo standard. *Lodermeier v. Class*, 1996 SD 134, ¶ 3, 555 N.W.2d 618, 621–22 (citing *Loop v. Class*, 1996 SD 107, ¶ 11, 554 N.W.2d 189, 191 (citations omitted)).

### Registration for Convicted Sex Offenders

[¶ 6.] In 1994, our Legislature enacted laws requiring registration for convicted sex offenders. SDCL 22–22–30, *et seq.* Registration applied initially to those convicted of specified sex offenses on or after July 1, 1994. 1994 S.D. Session Laws, ch. 174, § 2. No public access was permitted to registration information. Furthermore, registration was not required for all sex offenses. It did not apply to the offense of statutory rape. *See* 1994 S.D. Session Laws, ch. 174, § 1.[2]

---

1. SDCL 22–22–1(5) provides:
 Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:
 (5) If the victim is ten years of age, but less than sixteen years of age, and the perpetrator is at least three years older than the victim[.]
 SDCL 22–22–7 provides in part:
 Any person, sixteen years of age or older, who knowingly engages in sexual contact with another person, other than that person's spouse if the other person is under the age of sixteen years is guilty of a Class 3 felony.

2. Under the law as enacted in 1994, the definition of "sex crime" included first and second degree rape as defined in SDCL 22–22–1, but not third degree. Although Meinders was indicted for second degree rape January 25, 1990, the Legislature amended SDCL 22–22–1 effective July 1, 1990, and reclassified statutory rape as third degree rape. Therefore, when the Legislature passed the sex offender registration statutes in 1994, the crime of statutory rape was classified as third degree rape and was not a crime for which registration was required.

[¶ 7.] A series of well-publicized tragedies illustrated the futility of sex offender registration without attendant public notification. One of the most notorious incidents occurred in New Jersey. There, in July 1994, seven year old Megan Kanka was raped and strangled. The man who confessed to murdering her lived across the street from her family. He had two previous convictions for sex offenses against little girls. Neither Megan's parents nor anyone else in the neighborhood was aware of his criminal history. Public outrage led to the passage of "Megan's Law," as it came to be called, that not only required sex offenders to register with local law enforcement, but also provided for varying degrees of public dissemination of registrant information. In the same year, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act of 1994. 42 U.S.C. § 14071 (1994). The Act conditioned the availability of federal crime prevention funds on a state's creation of a sex offender registration system and a community notification program. Today all fifty states require some form of mandatory sex offender registration.

[¶ 8.] In 1995, South Dakota enacted its own version of "Megan's Law" by amending the sex offender registration statutes to include a public access provision. The Legislature also amended the statutes to have retroactive application. 1995 S.D. Session Laws, ch. 123, § 2. SDCL 22–22–31 now provides:

> Any person residing in this state who has been convicted whether upon a verdict or plea of guilty or a plea of nolo contendere, or who has received a suspended imposition of sentence which has not been discharged pursuant to § 23A–27–14 prior to July 1, 1995, for commission of a sex crime, as defined in § 22–22–30,[3] or any person who is a juvenile fifteen years of age or older adjudicated of a sex crime, as defined in subdivisions 22–22–30($l$) or (9), or of felony sexual contact, as defined in § 22–22–7.2, shall, within ten days of coming into any county to reside or temporarily domicile for more than thirty days, register with the chief of police of the municipality in which the person resides, or, if no chief of police exists, then with the sheriff of the county in which the person resides. A violation of this section is a Class 1 misdemeanor. However, any subsequent violation is a Class 6 felony. Any person whose sentence is discharged under § 23A–27–14 after July 1, 1995, shall forward a certified copy of such formal discharge by certified mail to the Division of Criminal Investigation and to local law enforcement where the person is then registered under this section.

3. SDCL 22–22–30 provides:
 For the purposes of §§ 22–22–31 to 22–22–39, inclusive, a sex crime is any of the following crimes regardless of the date of the commission of the offense or the date of conviction:
 (1) Rape as set forth in § 22–22–1;
 (2) Sexual contact with a minor under sixteen as set forth in § 22–22–7 if committed by an adult and the adult is convicted of a felony;
 (3) Sexual contact with a person incapable of consenting as set forth in § 22–22–7.2 if committed by an adult;
 (4) Incest as set forth in § 22–22–19.1 if committed by an adult;
 (5) Photographing a child in an obscene act as set forth in § 22–22–23;
 (6) Possession of child pornography as set forth in § 22–22–23.1;
 (7) Sale of obscene pictures of a child as set forth in § 22–22–24;
 (8) Kidnapping, as set forth in § 22–19–1, if the victim of the criminal act is a minor;
 (9) Promotion of prostitution of a minor as set forth in subdivision 22–23–2(2);
 (10) Criminal pedophilia as set forth in § 22–22–30.1;
 (11) Felony indecent exposure as set forth in former § 22–24–1 or indecent exposure as set forth in § 22–24–1.2;
 (12) An attempt to commit any of the crimes listed in this section; or
 (13) Any crime committed in a place other than this state which would constitute a sex crime under this section if committed in this state.

Upon receipt of such notice, the person shall be removed from the sex offender registry open to public inspection and shall be relieved of further registration requirements under this section.

SDCL 22–22–40 provides, in part:

Registration records collected by local law enforcement agencies pursuant to this chapter, registration lists provided to local law enforcement by the Division of Criminal Investigation, and records collected by institutions pursuant to § 22–22–38 for those persons required to register under the provisions of § 22–22–30 to 22–22–39 are public records as provided in chapter 1–27.

The question before us today is whether these statutes violate the ex post facto prohibitions in our state and federal constitutions.

## 1. Retroactive Application of Sex Offender Registration Laws

 [¶ 9.] The United States Constitution declares that "[n]o State shall ... pass any ... ex post facto [l]aw." U.S.Const. art. I, § 10, cl. 1; see art. I, § 9, cl. 3. The South Dakota Constitution has an equivalent provision. S.D.Const. art. VI, § 12. These constitutional prohibitions bar retroactive application of any law inflicting greater punishment for a crime than the law originally rendered at the time the crime was committed. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648, 650 (1798). The prohibition fulfils two principles: (1) legislative enactments must give fair warning of their effect, thus allowing reliance on the current law until it is legislatively changed; and (2) laws cannot arbitrarily or vindictively punish persons for past acts that were not criminal or were less criminal when they were committed. *See Miller v. Florida*, 482 U.S. 423, 429–30, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351, 359–60 (1987) (discussing the two traditional purposes of Ex Post Facto Clause); *Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17,

22–23 (1981) (explaining the ex post facto prohibition).

 [¶ 10.] The prohibition against ex post facto laws applies to penal statutes imposing criminal sanctions. *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30, 38 (1990) (citations omitted); *Lewis v. Class*, 1997 SD 67, ¶ 16, 565 N.W.2d 61, 64 (citations omitted) (prohibition applies to statutes that exact penalties). Ex post facto claims are questions of law reviewable de novo. *Id.* ¶ 9, 565 N.W.2d at 63 (citing *State v. Karp*, 527 N.W.2d 912 (S.D.1995)). Challenges to the constitutionality of a statute are not lightly met:

"There is a strong presumption that the laws enacted by the [L]egislature are constitutional and that presumption is rebutted only when it clearly, palpably and plainly appears that the statute violates a provision of the constitution." Further, the party challenging the constitutionality of a statute bears the burden of proving beyond a reasonable doubt that the statute violates a state or federal constitutional provision.

*Sedlacek v. South Dakota Teener Baseball Program*, 437 N.W.2d 866, 868 (S.D.1989) (quoting *Oien v. City of Sioux Falls*, 393 N.W.2d 286, 289 (S.D.1986) (other citations omitted)).

 [¶ 11.] Meinders asserts that South Dakota's sex offender registration laws (SDCL 22–22–30 through 22–22–40 and 23–5–14) as applied to him violate the ex post facto clauses of our state and federal constitutions. He contends that dissemination of registrant data may result in loss of employment, invasion of privacy, media scrutiny, and physical attacks by vigilantes once he is released from prison. He argues that the public dissemination of the registration information is excessive because there are no restrictions on who can access the information, no limit on the length of time an offender must register, and no procedure by which an offender can be relieved of the obligation to report. The trial court found that the statutes

were not punitive and, therefore, they did not violate the ex post facto prohibitions.

[¶ 12.] This is an issue of first impression in South Dakota. Meinders was convicted on July 20, 1990, before the enactment of sex offender registration. These laws thus apply retroactively to him and, therefore, if punitive, rather than remedial, they violate the ex post facto clauses of our state and federal constitutions. Accordingly, we must examine whether our sex offender registration laws are punitive or remedial in nature.

> In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc., it has been considered penal. But a statute has been considered nonpenal if it imposes a disability, not to punish, but accomplish some other legitimate governmental purpose. The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature.

*Trop v. Dulles,* 356 U.S. 86, 96, 78 S.Ct. 590, 595–96, 2 L.Ed.2d 630, 639–40 (1958) (footnotes omitted).

[¶ 13.] First, in ascertaining the evident purpose of the Legislature we look to whether it "indicated either expressly or impliedly a preference for one label or the other." *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742, 749 (1980). We have no legislative history to aid in determining the purpose of the sex offender registration statutes. However, 1994 S.D. Session Laws chapter 174 states that the statutes are "[a]n Act to provide for the registration of convicted adult sex offenders." In addition, 1995 S.D. Session Laws chapter 123 explains that the sex offender registration laws are "[a]n Act to track the whereabouts of cer-

tain sex offenders residing in South Dakota." We conclude that the Legislature's intention in requiring registration was to accomplish the regulatory purpose of assisting law enforcement in identifying and tracking sex offenders to prevent future sex offenses, especially those against children. Furthermore, the purpose of the public access to registrant information as provided in SDCL 22–22–40 was to alert the public in the interest of community safety, and to prevent and promptly resolve incidents involving sexual offenses. These are remedial measures akin to warning communities of potential health hazards. A legislative intent to be remedial and not punitive, however, will not end our inquiry.

[¶ 14.] Second, even when legislative intent is remedial, we must still determine if the registration and notification scheme is so effectively punitive that it negates the remedial intention. *Ward,* 448 U.S. at 248–49, 100 S.Ct. at 2641, 65 L.Ed.2d at 749. The most important consideration here is whether this statutory scheme, "while perhaps having certain punitive aspects, serve[s] important nonpunitive goals." *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549, 569 (1996). The overriding aim of these statutes is the protection of children from the predations of sex offenders. No society can long last that neglects to secure and preserve its children. This design is protective, remedial, not punitive. In *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the United States Supreme Court held that under a Kansas civil commitment statute for sex offenders, "[e]ven if we accept [a] determination that the provision of treatment was not the Kansas Legislature's 'overriding' or 'primary' purpose in passing the Act, this does not rule out the possibility that an ancillary purpose of the Act was to provide treatment, and it does not require us to conclude that the Act is punitive." *Id.* at 367, 117 S.Ct. at 2084, 138 L.Ed.2d at 518. Only by the "clearest

proof" can it be shown that what was created as remedial is in fact punitive. *Ward*, 448 U.S. at 248–49, 100 S.Ct. at 2641, 65 L.Ed.2d at 749 (citing *Flemming v. Nestor*, 363 U.S. 603, 617–21, 80 S.Ct. 1367, 1376–78, 4 L.Ed.2d 1435 (1960)[*Nestor*]); *see also Hendricks*, 521 U.S. at 361, 117 S.Ct. at 2082, 138 L.Ed.2d at 515; *Doe v. Pataki*, 120 F.3d 1263, 1274 (2dCir.1997)[*Pataki*](citing *Ursery*, 518 U.S. at 290, 116 S.Ct. at 2148, 135 L.Ed.2d 549). It is a "highly context specific matter." *Pataki*, 120 F.3d at 1275 (citing *Nestor*, 363 U.S. at 616, 80 S.Ct. at 1375). Lastly, "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the 'sting of punishment.'" *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 777, n. 14, 114 S.Ct. 1937, 1945, n. 14, 128 L.Ed.2d 767, 777, n. 14 (1994).

[¶ 15.] Many courts faced with deciding if sex offender registration schemes are punitive in effect have applied the factors set forth by the United States Supreme Court in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *See, e.g., State v. Noble*, 171 Ariz. 171, 829 P.2d 1217, 1221 (1992) (en banc); *Collie v. State*, 710 So.2d 1000, 1009 (Fla. App. 2 Dist.1998); *State v. Pickens*, 558 N.W.2d 396, 398–99 (Iowa 1997); *State v. Manning*, 532 N.W.2d 244, 247 (Minn.Ct. App.1995); *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, 582 (1998), *cert. denied, Cook v. Ohio*, —— U.S. ——, 119 S.Ct. 1122, 143 L.Ed.2d 116 (1999); *State v. Ward*, 123 Wash.2d 488, 869 P.2d 1062, 1068 (1994) (en banc). *But see Artway v. Attorney General of State of NJ*, 81 F.3d 1235, 1261–62, *reh'g denied* 83 F.3d 594 (3rdCir.1996)(finding Mendoza–Martinez factors "inapplicable outside the context of determining whether a proceeding is sufficiently criminal in nature to warrant criminal procedural protections of the Fifth and Sixth Amendments."). In a different context, we applied these factors to decide if a sanction was civil or penal in nature.

*State v. Feiok*, 364 N.W.2d 536, 540 (S.D. 1985).

[¶ 16.] The Mendoza–Martinez factors include:

[a.] Whether the sanction involves an affirmative disability or restraint[;]

[b.] Whether it has historically been regarded as a punishment[;]

[c.] Whether it comes into play only on a finding of scienter[;]

[d.] Whether its operation will promote the traditional aims of punishment—retribution and deterrence[;]

[e.] Whether the behavior to which it applies is already a crime[;]

[f.] Whether an alternative purpose to which it may rationally be connected is assignable for it[;] and

[g.] Whether it appears excessive in relation to the alternative purpose assigned[.]

*Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d at 660–61. These considerations afford guidance, but they are "neither exhaustive nor dispositive." *Ward*, 448 U.S. at 249, 100 S.Ct. at 2641–42, 65 L.Ed.2d at 750; *Feiok*, 364 N.W.2d at 540. Indeed, some factors may contradict others. *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d at 661.

### a. Affirmative Disability or Restraint

[¶ 17.] Registering imposes no "affirmative disability or restraint" in the traditional sense on convicted sex offenders. Their movements and activities are not restricted in the manner usually associated with criminal punishment. *State v. Myers*, 260 Kan. 669, 923 P.2d 1024, 1041 (1996), *cert. denied, Kansas v. Myers*, 521 U.S. 1118, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997); *Manning*, 532 N.W.2d at 248. They may live in any community in South Dakota, subject to the requirement that they register with local law enforcement. *See Ward*, 869 P.2d at 1069. If the act of registration

is distressing, subjecting registrants to increased scrutiny, it nonetheless creates no affirmative disability or punitive restraint flowing from the registration requirement itself.

[¶ 18.] Although registration information is subject to South Dakota's open records laws, and is thus available to the public, there are no affirmative community notification provisions. SDCL 22–22–40 (registration information is a public record as provided in Chapter 1–27). To obtain the information a member of the public must seek it out at a government office. Details available include the registrant's name, description, and address, the type of sex crime committed, and the dates of both commission and conviction. No restrictions are placed on who may access the information. Some states' laws are more restrictive in either accessing or disseminating registry information. *See Myers,* 923 P.2d at 1029 (stating that, as of 1996, "besides the Kansas statute, only the Georgia and South Dakota statutes allow unrestricted public access to registrant information"). Meinders contends that the practical effect of such broad access of offender data makes it difficult for registrants to obtain housing or employment and consequently the law may act as an affirmative restraint or disability. *See Myers,* 923 P.2d at 1041. Additionally, Meinders insists, the public stigma and ostracism accompanying the "sex offender" label may act as an affirmative restraint or disability and may subject the registrant to threats and physical attacks by individuals acting as vigilantes. Registration may have some adverse affect on Meinders' life after release. Yet the question remains, is the intent of registration remedial?

[¶ 19.] Meinders is still in the penitentiary and may remain there for years. Once he is released, on parole or otherwise, his felonies will remain a public record forever, unless he is pardoned. If, based on registration and notification, vigilante lawbreakers seek to do him harm, either through knowledge of his record or because of his registration, the State in no way can be held complicit in those criminal acts. As recognized in *Pataki,* those incidents result from the foul impulses of third parties that "essentially [flow] from the . . . underlying conviction." 120 F.3d at 1280. Such retaliatory behavior, however unjustified, is responsive to the offender's own criminal conduct which resulted in conviction, not the registration and notification statutes. Yet, the Legislature also took measures to protect registrants by passing a statute that punishes those who commit these types of attacks. *See* SDCL 22–22–41 (mandating felony criminal penalties for any person that commits a crime as a result of information obtained through the sex offender registry). The information contained in the sex offender registry is almost the same information available as a public record in the courthouse where the conviction occurred. "An offender's conviction is a matter of public record regardless of the registration." *Manning,* 532 N.W.2d at 248; *see Pataki,* 120 F.3d at 1280. The same information can be learned by those who are spectators at the offender's hearing or who read a newspaper article about the case.

### b. Not Historically Considered Punishment

[¶ 20.] Registration and public access to registrant data have not historically been viewed as punishment. *See generally Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957) (finding felony registration law permissible law enforcement tool, but individual must have "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply" before a conviction under the law can stand). *See also Pickens,* 558 N.W.2d at 400; *Manning,* 532 N.W.2d at 248; *Cook,* 700 N.E.2d at 582. *But see Noble,* 829 P.2d at 1222 ("registration has traditionally been viewed as punitive."). "Governments often use varying methods of registration as a way for law enforcement

agencies to have easy access to necessary information." *Manning,* 532 N.W.2d at 248.

### c. Scienter Requirement

[¶ 21.] Existence of the requirement of scienter is customarily important in distinguishing criminal from civil statutes. *See Mendoza–Martinez,* 372 U.S. at 168, 83 S.Ct. at 567, 9 L.Ed.2d at 661. Whether the registration requirement requires a finding of scienter is a separate issue from whether a criminal conviction for failure to register requires a finding of scienter. *See State v. Burr,* 598 N.W.2d 147, 153 (N.D.1999) (citing *Manning,* 532 N.W.2d at 247–48). Although those required to register have been convicted of a sex offense, the registration statutes themselves do not contain an additional requirement of scienter. *Arizona Dep't of Public Safety v. Superior Court,* 190 Ariz. 490, 949 P.2d 983, 990 (App.Div. 1997). The registration requirements are triggered simply by the offender's arrival in a community. The act of failing to register alone triggers the criminal punishment in SDCL 22–22–31. SDCL 22–22–38 and 22–22–39 require that offenders be informed of the duty to register before discharge, parole, or probation. *See Cook,* 700 N.E.2d at 583. As the Ninth Circuit Court of Appeals stated:

> We emphasize that the crime of failing to register under the Act constitutes a separate offense. The fact that a prior conviction for sexual misconduct is an element of the "failure to register" offense is of no consequence. It is hornbook law that no *ex post facto* problem occurs when the legislature creates a new offense that includes a prior conviction as an element of the offense, as long as the other relevant conduct took place after the law was passed. The Supreme Court has recently suggested as much. *See United States v. Watts,* [519] U.S.[148], 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

*Russell v. Gregoire,* 124 F.3d 1079, 1088–89 (9thCir.1997).

### d. Operation Will Not Promote Retribution or Deterrence.

[¶ 22.] Meinders alleges that the registration requirement and subsequent public availability of information on his conviction for statutory rape will promote punishment and deterrence. Because of this, he argues, the regulatory nature of the statutes is destroyed. "[T]he argument that the registration law promotes traditional goals of punishment and deterrence has been rejected by other courts on the ground that the primary purpose of a sex offender registry is not to punish but to aid the efforts of law enforcement officers in protecting society." *Pickens,* 558 N.W.2d at 400. In addition, deterrence presupposes that punishment will discourage a certain act. Arguably, many sex offenders remain undeterred even by the threat of incarceration. *Cook,* 700 N.E.2d at 583. To these persons the registration and notification laws hold little further deterrence.

[¶ 23.] Even if there is some deterrent effect to the registration requirement, that will not negate the overall regulatory or remedial nature of the statute. *Manning,* 532 N.W.2d at 248; *Cook,* 700 N.E.2d at 583. "Although the Act may implicate deterrence, it does not implicate the other primary objective of criminal punishment, retribution, because it neither labels the offender as more culpable than before (though his or her culpability may be more widely publicized), nor does it turn on a finding of *scienter.*" *Gregoire,* 124 F.3d at 1091. The objective of the statutes is to protect children and other vulnerable individuals against future offenses. *See Cook,* 700 N.E.2d at 583 (stating: "[T]hese provisions have the remedial purpose of collecting and disseminating information to relevant persons to protect the public from registrants who may reoffend."). Although it is obviously embarrassing to be included on the register,

humiliation is not a form of punishment. *Arizona Dep't of Public Safety,* 949 P.2d at 990–91.

### e. Not a Second Punishment

[¶ 24.] The registration requirement is triggered by a conviction for one of the enumerated sex crimes in SDCL 22–22–30. Any punishment flowing from the sex offender registration statutes comes from a failure to register, not from the past sex offense. *Cook,* 700 N.E.2d at 584.

### f. Rationally Related Alternative Purpose

▆▆▆ [¶ 25.] Is there a nonpunitive or alternative purpose rationally related to the registration and notification statutes? *Arizona Dep't of Public Safety,* 949 P.2d at 991. The nonpunitive, regulatory purpose of the sex offender registration laws is to assist law enforcement investigations and protect citizens, especially children, against future sex offenses. *Id.* at 991–92; *Manning,* 532 N.W.2d at 248; *Cook,* 700 N.E.2d at 584. "In general, protection of the public is a paramount government function enforced through the police power." *Cook,* 700 N.E.2d at 584 (citation omitted). Our registration laws were created out of a concern for public safety, especially the protection of children, not from a desire to increase punishment. *Pickens,* 558 N.W.2d at 400. Public access to the information ensures that sex offender data is available to those seeking the safety the law is designed to afford.

### g. Alternative Purpose Not Excessive

[¶ 26.] Meinders argues that even if the legislative purpose for allowing public access to the information is regulatory and not intended to punish sex offenders, unrestricted access given to the public is excessive as applied to him and goes beyond what is necessary to promote public safety. *See Myers,* 923 P.2d at 1043. Meinders contends that one convicted of statutory rape should not face the same consequences as those convicted of child

molesting, where there is greater likelihood of recidivism. Generally, the registration requirements of SDCL 22–22–31 are not excessive in relation to the regulatory purpose of assisting law enforcement to prevent future crimes. Courts have overwhelmingly upheld registration provisions similar to the ones under review here. The registration portion of South Dakota's sex offender registration statutes (SDCL 22–22–30 through SDCL 22–22–39) are not punitive and do not violate the prohibition against ex post facto laws.

[¶ 27.] South Dakota's sex offender registration statutes have no provisions for classifying offenders according to their risk of recidivism. Instead, our law provides that all individuals convicted of one of the specified offenses must register for life, and it allows public access to the registration information, regardless of a prior assessment of the offender's risk of recidivism or threat to the community. Some states provide for varying degrees of public notification based on the offender's risk of recidivism. *See, e.g.,* Del.Code Ann. tit. 11, § 4121 (Supp. 1998) (providing for different periods of registration and different levels of public notification based on risk assessment tier assigned to offender); Idaho Code § 18–8314 (Supp. 1998) (duty of sexual offender classification board to determine whether an offender is a violent sexual predator with a high risk of reoffending); Ky.Rev.Stat.Ann. § 17.572 (Supp. 1998) (providing for different levels of public notification depending on the risk assessment of the offender); Me.Rev.Stat. Ann. tit. 34–A, § 11141 (Supp. 1998) (providing for risk assessment to determine the extent of notification to law enforcement and public); Minn.Stat.Ann. § 244.052 (Supp. 2000) (providing for a risk assessment scale which is used to identify the offender's risk level; the extent of disclosure is determined by the offender's risk level); Neb.Rev.Stat. § 29–4013 (Supp. 1998) (providing three levels of notification based on risk of recidivism).

[¶ 28.] Largely, the relative culpability of statutory rape as compared to other sex offenses is a value judgment. If the Legislature perceives a need to protect young people from those who would engage them in sexual activities, are we able to proclaim in response that the perception of the danger is so skewed and the measures taken so immoderate that our federal and state constitutions will not tolerate the enactments to stand? Our answer must be given in deference to our limited role in reviewing legislation. Although we might perceive a distinction in the need for registration and public notification between statutory rapists and other sex offenders, we are not free as judges to overrule legislative values. We pass only on the permissible scope of legislative regulation, not its wisdom. The view that judges function to fine tune legislative excess has long been discarded. Only when statutes are plainly and unmistakably unconstitutional may we declare them void. *State v. Laible,* 1999 SD 58, ¶ 10, 594 N.W.2d 328, 331 (citing *Taylor Properties, Inc. v. Union County,* 1998 SD 90, ¶ 10, 583 N.E.2d 638, 640 (other citations omitted)). A statute is presumed constitutional until it is proved otherwise beyond a reasonable doubt. *Id.* (citing *State v. Baker,* 440 N.W.2d 284, 287 (S.D.1989) (citation omitted)).

[¶ 29.] Recognizing the pernicious impact of crimes against children, "our Legislature in recent years has revised the law prohibiting statutory rape to reflect its accelerating concern with protecting children. In 1980 the law was amended to increase the penalty from ten to fifteen years and in 1984 amended again to raise the age of consent from fifteen to sixteen. *See* SDCL 22–1–1(5), 1980 SL ch. 175; 1984 SL ch. 167." *State v. Bonner,* 1998 SD 30, ¶ 28, 577 N.W.2d 575, 583. In increasing the ambit of statutory rape prohibitions, the Legislature obviously concluded that young adolescents need additional protections.

[¶ 30.] Public access to registrant information is a logical extension of the registration process. When the public is not allowed access to the information collected to promote public safety, or if the information is unreasonably restricted, then the registration and notification system is purposeless. The Legislature obviously contemplated that law enforcement and the public would be allowed to use the information to make informed and knowledgeable decisions about safety issues. Moreover, under chapter 1–27 of our code, the registration records are ' only open for viewing at certain locations. Nowhere in our statutes is wide public dissemination authorized, as in some jurisdictions where registration data is published in local newspapers. Although police will directly receive the information, the public must go to a local law enforcement agency or a state office to access the information. This is hardly the "poster-on-every-corner" notification that Meinders implies exists.

[¶ 31.] In some instances, requiring sex offenders to register with local law enforcement for life may result in hardship. This, however, cannot overcome the deference we must give to the Legislature's law-making authority. Furthermore, though Meinders paints a bleak picture for those convicted of statutory rape, if sentencing judges believe there are sufficient mitigating factors in a statutory rape case, they can grant a suspended imposition of sentence, which will relieve the offender of the registration requirements upon discharge. SDCL 22–22–31.

[¶ 32.] Chief Justice Robert N. Wilentz of the New Jersey Supreme Court delivered a powerful statement in that state's seminal case addressing "Megan's Law." He wrote:

The choice the Legislature made was difficult, for at stake was the continued apparently normal lifestyle of previously-convicted sex offenders, some of whom were doing no harm and very well might never do any harm, as weighed

against the potential molestation, rape, or murder by others of women and children because they simply did not know of the presence of such a person and therefore did not take the common-sense steps that might prevent such an occurrence. The Legislature chose to risk unfairness to the previously-convicted offenders rather than unfairness to the children and women who might suffer because of their ignorance....

*Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 373 (N.J.1995). The Legislature is "not required to act with perfect precision." *Pataki,* 120 F.3d at 1283. So long as the regulation is appropriate to promote the nonpunitive goal of the statute, the character of the statute does not change, even when the Legislature casts a "wide net." *Id.* at 1282–83. When the health and welfare of innocents are at stake, the most reasonable action is the one that prevents needless tragedies. Meinders has not shown clear proof that this remedial statute is punitive in nature.

[¶ 33.] On the other hand, many states limit the length of registration and provide for classification of offenders into levels based on risk of recidivism. The dissent seizes on these other regulatory schemes and cites a minority case, *Myers, supra,* to argue that South Dakota's sex offender registration law is unconstitutional as applied to Meinders.[4] Yet, the dissent is nothing less than an attack on the crime of statutory rape itself. It seeks to distinguish this felony from other types of sex offenses by suggesting that "similar relationships grow into reasonably good marriages from time to time." What other crimes might one sanctify with such logic? Worse, the dissent quotes A.G.'s childish perception of years ago that she was in a "dating relationship" as if that comment

should reproach her and excuse Meinders. Her naïve remark made at a most troubled time in her life is precisely why our Legislature made having sex with underage adolescents a crime. Our legislators recognized what the dissent appears reluctant to acknowledge: young adolescents can be vulnerable, impressionable, and sometimes subject to making ill-advised choices, especially when put upon by adults. The very essence of statutory rape is that children are incapable of giving consent. In its effort to downgrade Meinders' crime, the dissent ignores the Supreme Court's admonishment that in assessing the constitutionality of these types of enactments, we must not take the offender's perspective. *Kurth Ranch,* 511 U.S. at 777, 114 S.Ct. 1937. Meinders' position to this very day is that he did nothing wrong. The dissent seems to embrace this attitude, characterizing Meinders' offense as "consensual" although illegal. Thus, the dissent proclaims, "Meinders' crime is not the type of crime that the sex offender registration statutes are intended to address." This may be the dissent's earnestly held belief, but where is it declared that we judges may override the Legislature's values with our own? *See Veeder v. Kennedy,* 1999 SD 23, ¶ 23, 589 N.W.2d 610, 616.

### Conclusion: South Dakota's Sex Offender Registration and Notification Laws are Constitutional

[¶ 34.] No one can say with certainty that Meinders, and others similarly convicted of statutory rape, will not again seek to begin another sexual relationship with a minor. Predictions of future offender behavior are famously unreliable. Meinders provides no convincing evidence, beyond the affidavit of one mental health professional, that as a group convicted statutory rapists are any less susceptible

---

4. The Jacob Wetterling Act advises limiting registration to ten years, unless the individual has one or more prior convictions for designated offenses, has been convicted of an aggravated sex offense, or has been classified as a "sexually violent predator." 42 U.S.C. § 14071(b)(6). However, the proposed guide-lines implementing this law explain that states wishing "to achieve compliance with the Jacob Wetterling Act should understand that its requirements constitute a floor for state registration systems, not a ceiling." 60 Fed.Reg. 18,613 (1995).

to recidivism than other types of sex offenders. But even if this is a reliable prediction, how can it apply to Meinders, a man who is uncooperative in sex offender treatment, who denies any wrongdoing despite the jury's verdict? Under current case law, both federal and state, our sex offender registration and notification statutes are regulatory, rather than penal. Meinders has not met his burden under the *Mendoza–Martinez* factors.[5]

[¶ 35.] The Legislature clearly envisioned that this type of offender should be "tracked." We cannot dispute the authenticity of this conclusion. Undoubtedly, those who perceive underage adolescents as fair game for sexual relationships create a real threat. Comparing our method of registration with more populous, urban states with denser law enforcement networks ignores that in some areas of our rural state the only source of law enforcement information may be the county sheriff. It resolves nothing to say that South Dakota has the toughest registration law concerning public access. All fifty states have similar enactments existing within a range, some tougher in one aspect or another. To be at one end of the spectrum is not equivalent to unconstitutionality.

[¶ 36.] In conclusion, we affirm the application of the registration and notification requirements to Meinders. Many other courts have upheld sex offender registration and notification laws. *See Roe v. Office of Adult Probation*, 125 F.3d 47 (2dCir.1997) (notification policy not punishment under ex post facto analysis); *Noble*, 171 Ariz. 171, 829 P.2d 1217 (access to sex offender register held constitutional when information was available to potential employers, government agencies); *People v. Logan*, 302 Ill.App.3d 319, 235 Ill.Dec. 539, 705 N.E.2d 152 (1998) (making information readily available to the public from the sex offender register was not punishment, thus not violative of the ex post facto clause); *Spencer v. O'Connor*, 707 N.E.2d 1039 (Ind.Ct.App.1999) (finding that the notification provisions of the sex offender registration statutes do not inflict punishment and, therefore, are valid); *Opinion of the Justices to the Senate*, 423 Mass. 1201, 668 N.E.2d 738 (1996) (community notification laws do not violate the ex post facto clause); *People v. Afrika*, 168 Misc.2d 618, 648 N.Y.S.2d 235 (N.Y.Sup.Ct.1996) (statutes requiring registration and notification to certain law enforcement agencies and community entities valid for dangerous sex offenders); *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570 (concluding that the notification statutes serve to protect the public, and thus limited dissemination of the information was constitutional); *Ward*, 123 Wash.2d 488, 869 P.2d 1062 (holding public disclosure of sex offender registration information valid when release is "necessary for public protection"); *see also Lanni v. Engler*, 994 F.Supp. 849, 854–55 (E.D.Mich.1998); *Gregoire*, 124 F.3d at 1093; *Doe v. Kelley*, 961 F.Supp. 1105, 1111–12 (W.D.Mich.1997).

[¶ 37.] It may well be, however, that in future sessions the Legislature will adopt amendments to tailor notification to the risk of recidivism certain sex offenders pose. Trial and error is the usual and certainly the most democratic way to remedy excesses or deficiencies in constitutionally sufficient legislation. Courts should only intercede when the constitution has been unmistakably breached.

## 2. Ex Post Facto Amendment of Good Time Laws

[¶ 38.] Meinders claims that the 1990 and 1994 amendments to SDCL 24–2–12 [6] and 24–2–18 [7] change good time and

---

5. As these laws are not penal, Meinders' claim that they are cruel and unusual must also fail. *Trop*, 356 U.S. at 95–97, 78 S.Ct. at 595, 2 L.Ed.2d at 639–40.

6. Before July 1, 1990, SDCL 24–2–12 provided:

> Every inmate against whom the disciplinary sanction of punitive confinement shall be awarded for violating any of the rules, regulations or policies of the peni-

result in a disadvantage to him. Therefore, he reasons that the application of the amended statutes to him violates the ex post facto clause. However, Steve Lee, Deputy Warden of the South Dakota State Penitentiary, testified at the habeas hearing that the amended statutes have not been applied to Meinders and he has lost no good time. Meinders does not argue otherwise. In addition, there are no plans to apply the amended statutes to him. Apparently, the prison authorities are abiding by a Seventh Circuit judge's decision declaring that retroactive application of the 1995 amendments to SDCL 24-2-18 violates the prohibition against ex post facto laws.

 [¶ 39.] The State claims that because the amended statutes have not been applied to Meinders, this issue is not ripe for judicial review. "Ripeness involves the timing of judicial review and the principle that '[j]udicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote.'" *Boever v. South Dakota Bd. of Accountancy,* 526 N.W.2d 747, 750 (S.D.1995) (alterations in original) (quoting *Gottschalk v. Hegg,* 89 S.D. 89, 228 N.W.2d 640, 643-44 (1975)). Courts should decide only mature controversies, eschewing advisory opinions and conjectural questions. *Kneip v. Herseth,* 87 S.D. 642, 214 N.W.2d 93, 96 (1974). "Even if a court has jurisdiction to decide the constitutionality of the law, it should decline to do so if the issue is so premature that the court would have to speculate as to the presence of a real injury." *Boever,* 526 N.W.2d at 750 (citing *Meadows of West Memphis v. City of West Memphis,* 800 F.2d 212, 214 (8thCir.1986)). Because the penitentiary authorities have not applied the amended statutes to Meinders and he has suffered no injury, we find that this issue is not ripe for judicial review.

### 3. Sex Offender Treatment and Self-Incrimination

 [¶ 40.] An inmate is required to admit the crime for which he is convicted in order to participate in STOP, the sex offender treatment program offered at the penitentiary. Meinders insists that this requirement violates his right against self-incrimination. He claims that "threats of conditioning release based upon a confession in treatment is improper unless the defendant has first been granted immunity."

[¶ 41.] Meinders was convicted of his crime in 1990. We summarily affirmed on direct appeal. As noted by the habeas court, double jeopardy considerations would prevent another conviction for this crime. "It is well established that the privilege [against self-incrimination] protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234, 240 (1972). Meinders has

---

tentiary, unless otherwise determined by the warden, shall be housed in the adjustment center section of the penitentiary for a period deemed necessary for the best interest of discipline, justice, rehabilitation and the protection of self and others. While under conviction for violation of such rules, regulations or policies, whether or not confined in the adjustment center, such inmate shall *automatically forfeit one day of time granted for good conduct for each day served under such conviction.* (Emphasis added.)

The Legislature amended SDCL 24-2-12 effective July 1, 1990 to provide, in pertinent part:

The disciplinary board, established by rules promulgated by the Department of Corrections, may take *away time granted for good* conduct pursuant *to § 24-5-1 for* violating any *of the rules or policies of the Department of Corrections,* following a hearing and subject to the approval of the warden or superintendent. (Emphasis added.)

7. SDCL 24-2-18 was amended in 1995 to allow the reduction of good time "for any person convicted of a sex crime within the meaning of § 22-22-30 who fails to fully cooperate with all treatment offered." 1995 SD Session Laws, ch. 138.

failed to show a real risk of criminal prosecution based on any statements he might make in treatment. Therefore, his Fifth Amendment right against self-incrimination is not violated by the program's rehabilitative requirement.

### 4. Ineffective Assistance of Counsel

[¶ 42.] Meinders claims his trial counsel was ineffective because he: (1) did not present a mistake of age defense; (2) did not present a lack of sexual penetration defense; and (3) failed to present evidence regarding the victim's prior sexual conduct and mental disorders. The habeas court found that Meinders failed to overcome the presumption that trial counsel was competent and effective.

> We have adopted the two-prong test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for ineffective assistance of counsel claims. First, [the applicant] must prove that his trial counsel's performance was deficient. He must show that trial counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." Secondly, he must show that the deficient performance "prejudiced the defense" by showing that "counsel's errors were so serious as to deprive the defendant of a fair trial[.]" The reasonableness of trial counsel's action is evaluated from his perspective at the time the alleged error occurred.

*Sund v. Weber,* 1998 SD 123, ¶ 13, 588 N.W.2d 223, 225 (quoting *Garritsen v. Leapley,* 541 N.W.2d 89, 93 (S.D.1995) (alterations in original) (quoting *Mitchell v. Class,* 524 N.W.2d 860, 862 (S.D.1994) (citations omitted))).

> Whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erroneous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did

or did not do in preparation for trial and in his presentation of the defense at trial. This court, however, may substitute its own judgment for that of the circuit court as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel.

*Sund,* 1998 SD 123, ¶ 14, 588 N.W.2d at 225 (quoting *Loop,* 1996 SD 107, ¶ 11, 554 N.W.2d at 191 (quoting *Aliberti v. Solem,* 428 N.W.2d 638, 640 (S.D.1988))).

[¶ 43.] There is a strong presumption that trial counsel's performance was competent, and the petitioner alleging ineffective assistance of counsel carries the heavy burden of overcoming that presumption. *Sprik v. Class,* 1997 SD 134, ¶ 23, 572 N.W.2d 824, 829 (citations omitted). "In reviewing trial counsel's performance it is not this Court's function to second guess the decisions of experienced trial attorneys regarding matters of trial tactics unless the record shows that counsel failed to investigate and consider possible defenses and to exercise their good faith judgment thereon." *Id.* ¶ 24, 572 N.W.2d at 829 (citing *Fast Horse v. Leapley,* 521 N.W.2d 102, 106 (S.D.1994); *Roden v. Solem,* 431 N.W.2d 665, 667 (S.D.1988); *State v. Walker,* 287 N.W.2d 705, 707 (S.D.1980); *Crowe v. State,* 86 S.D. 264, 194 N.W.2d 234, 238 (1972)).

[¶ 44.] Mistake of age is not a defense to statutory rape. *State v. Fulks,* 83 S.D. 433, 160 N.W.2d 418, 420 (1968) (stating: "In a prosecution for alleged statutory rape[,] the defendant's knowledge of the age of the girl involved is immaterial and his reasonable belief that she is over the age of [consent] is no defense."). Meinders' counsel did propose a jury instruction on mistake of fact. The trial court rejected the proposed instruction.

[¶ 45.] The trial court granted a motion in limine preventing the State from introducing evidence of the victim's pregnancy, unless the defense opened the door. If Meinders' counsel had attempted to in-

troduce evidence that no sexual penetration had occurred, then the State would have been able to introduce the pregnancy to rebut that claim. Therefore, Meinders has not shown that counsel was deficient in failing to present a lack of sexual penetration defense.

 [¶ 46.] Meinders claims that trial counsel should have introduced evidence of the victim's past sexual conduct and alleged mental disorders. However, trial counsel could have reasonably believed that evidence of the victim's past sexual conduct was inadmissible under our rape shield laws and Meinders has not shown that such evidence would have been admissible.[8] In addition, Meinders has not presented any evidence that the victim was suffering from any mental disorders which would affect her credibility.

[¶ 47.] After reviewing the record, we find that Meinders has failed to show that trial counsel's performance was deficient. Therefore, it is unnecessary to reach the prejudice prong of the *Strickland* test. We affirm the circuit court's denial of habeas corpus relief based on ineffective assistance of counsel.

[¶ 48.] Affirmed.

[¶ 49.] MILLER, Chief Justice and GILBERTSON, Justice, concur.

[¶ 50.] SABERS, and AMUNDSON, Justices, concur in part and dissent in part.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 51.] I concur with Issues 2, 3, and 4 but dissent on Issue 1[g]. I vote to reverse and remand for purposes of limiting public access to Meinders' sex offender registry information and the lifetime requirement of registration, without any mechanism for relief.

[¶ 52.] **We should affirm the application of the registration requirements to**

8. Meinders' trial counsel died before the habeas proceeding; thus no evidence was pre-

Meinders for law enforcement purposes. However, the retroactive application of SDCL 22–22–40 to Meinders as it relates to public access is unconstitutional. We should hold that the portion of SDCL 22–22–40 providing for unlimited public access is unconstitutional as it applies to these facts – where the conviction is for statutory rape arising out of a dating relationship, where there was consent, although illegal, giving rise to a crime not shown to likely be repeated, as opposed to child molestation – because it is punitive, not remedial, and such punishment is more burdensome now than when the crime was committed. Therefore, Meinders should be released from the registration requirements of SDCL 22–22–30 through 22–22–39 and SDCL 22–22–40, unless procedures are instituted to limit public access to Meinders' registry information and provide a mechanism for relief from the lifetime registration requirement.

[¶ 53.] In determining whether this sex offender registration law is punitive, the majority opinion applied the *Mendoza–Martinez* factors:

[a.] Whether the sanction involves an affirmative disability or restraint[;]

[b.] Whether it has historically been regarded as a punishment[;]

[c.] Whether it comes into play only on a finding of scienter[;]

[d.] Whether its operation will promote the traditional aims of punishment –retribution and deterrence[;]

[e.] Whether the behavior to which it applies is already a crime[;]

[f.] Whether an alternative purpose to which it may rationally be connected is assignable for it[;] and

[g.] Whether it appears excessive in relation to the alternative purpose assigned[.]

sented on his reasoning or trial strategy.

*Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644, 661 (1963). The majority opinion concluded that Meinders did not meet his burden under these factors. I disagree. More specifically, I disagree with the conclusion that Meinders did not meet his burden under [g.] – whether the broad public dissemination of the registration information allowed under SDCL 22–22–40 and the lifetime requirement of registration, without any mechanism for relief, is excessive in relation to the alternative purpose assigned.

[¶ 54.] Other states provide for varying degrees of public notification based on the offender's risk of recidivism. *See, e.g.,* Del.Code Ann. tit. 11, § 4121 (Supp. 1998) (providing for different periods of registration and different levels of public notification based on risk assessment tier assigned to offender); Idaho Code § 18–8314 (Supp. 1999) (authorizing a sexual offender classification board to determine whether an offender is a violent sexual predator with a high risk of reoffense); Ky.Rev. Stat.Ann. § 17.572 (Supp. 1998) (providing for different levels of public notification depending on the risk assessment of the offender); Me.Rev.Stat.Ann. tit. 34–A, § 11141 (Supp. 1998) (requiring the utilization of a risk assessment instrument to determine the extent of notification to law enforcement and public); Minn.Stat.Ann. § 244.052 (Supp. 2000) (providing for a risk assessment scale which is used to identify the offender's risk level; the extent of disclosure is determined by the offender's risk level); Neb.Rev.Stat. § 29–4013 (Supp. 1998) (providing three levels of notification based on risk of recidivism).

[¶ 55.] South Dakota's sex offender registration statutes provide no provisions for classifying offenders according to their risk of recidivism. Instead, South Dakota law provides that *all* individuals convicted of one of the specified offenses must register *for life,* and it allows the public unrestricted access to the registration information, regardless of the offender's risk of recidivism or threat to the community. Under the particular facts of this case, this application of SDCL 22–22–40 to Meinders is excessive because it goes beyond the regulatory purpose of the sex offender registration statutes and is punitive.

[¶ 56.] We note that the sex offender registration statutes initially enacted in 1994 did not apply to the offense of statutory rape. *See* 1994 SD Session Laws ch. 174, § 1.[9] Although statutory rape is a serious crime, it must be noted that this was a "consensual relationship" between a rebellious fifteen-year-old, incapable of legal consent, and a nineteen-year-old. A.G. characterized the relationship as a dating relationship. Although far from ideal, similar relationships grow into reasonably good marriages from time to time. Meinders' crime is not the type of crime that the sex offender registration statutes are intended to address. Although one cannot discern with certainty the motivating factors of Meinders' conduct, these facts do not show that Meinders poses a significant risk of reoffending justifying the retroactive application of the public dissemination portion of the sex registration statutes. *See State v. Myers,* 260 Kan. 669, 923 P.2d 1024, 1042–43 (1996).

[¶ 57.] Although the legislative purpose for allowing public access to the information is regulatory and not intended to punish the offenders, "[t]he unrestricted public access given to the sex offender registry is excessive [as applied to Meinders] and goes beyond that necessary to promote public safety." *Myers,* 923 P.2d at 1043.

9. Under the law as enacted in 1994, the definition of "sex crime" included first and second degree rape as defined in SDCL 22–22–1, but not third degree. Although Meinders was indicted for second degree rape January 25, 1990, the legislature amended SDCL 22–22–1 effective July 1, 1990 and reclassified statuto- ry rape as third degree rape. Therefore, when the legislature passed the sex offender registration statutes in 1994, the crime of statutory rape was classified as third degree rape and was not a crime for which registration was required.

While the legislative aim may have been remedial, the repercussions, regardless of the justification, are great enough to be considered punishment as applied to Meinders. South Dakota then takes this "punishment" one step further and requires lifetime registration and provides no mechanism for sex offenders to petition for relief from the registration requirement.[10]

[¶ 58.] In contrast, other states limit the length of registration and provide for classification of offenders into levels based on risk of recidivism. *See, e.g.,* Ariz.Rev.Stat. Ann. § 13–3821 (Supp. 1998) (limiting length of registration requirement); Colo. Rev.Stat.Ann. § 18–3–412.5(6.5) & (7) (1999) (providing for varying periods of registration depending on degree of crime committed; limiting public access to registry information); Del.Code.Ann. tit. 11, § 4120(a) (Supp. 1998) (allowing offender to petition for release from registration requirement if no subsequent conviction within fifteen years and not likely to pose threat to society); *Idaho Code* § 18–8310 (Supp. 1999) (allowing offender to petition for relief from registration requirement after ten years, unless designated as a violent sexual predator); Iowa Code Ann. § 692A.2 (Supp. 1999) (requiring registration for ten years if first offense; second and third offenses result in lifetime registration); Ky.Rev.Stat.Ann. § 17.520 (Supp. 1998) (providing for ten year registration period if offender is designated low or moderate risk; lifetime registration required for high risk offenders only, but includes provision for relief from lifetime registration); Me.Rev.Stat.Ann. tit. 34–A, § 11003 (Supp. 1998) (providing for fifteen year registration requirement; offender may petition for relief from registration requirement after five years and sentencing court may waive registration for good cause); Minn.Stat. § 243.166 (Supp. 2000)

(requires registration for ten years or until "probation, supervised release, or conditional release period expires, whichever occurs later"); Neb.Rev.Stat. § 29–4005 (Supp 1998) (requires registration for ten years, unless the individual is found to be a sexually violent offender); N.D.Cent.Code § 12.1–32–15(8) (1999) (requires registration for a ten year period for first offense; lifetime registration is required for specific offenders); Or.Rev.Stat. § 181.600 (1997) (allowing offender to petition for relief from registration requirement after ten years). In addition, the federal version of this law limits registration to only ten years, unless the individual has one or more prior convictions for designated offenses, has been convicted of an aggravated sex offense, or has been classified as a "sexually violent predator." 42 U.S.C. § 14071(b)(6).

[¶ 59.] Under the facts of this case, unlimited public access to registry information for the lifetime of the offender without any mechanism for relief therefrom is punishment as applied to Meinders.[11] *See Myers*, 923 P.2d at 1043. Would-be sex offenders have been on notice since July 1, 1994 that they will be subjected to public disclosure if they commit specific sex offenses. Meinders was convicted of statutory rape in July of 1990. He could not possibly be charged with having notice of these unlimited public disclosure statutes. Based on the punishment effect of these statutes as well as the lack of notice to Meinders, the application of SDCL 22–22–40 to Meinders as it relates to unlimited public access without any mechanism for relief from the lifetime registration requirement violates the constitutional prohibitions against ex post facto laws.

[¶ 60.] In conclusion, we should affirm the application of the registration require-

---

**10.** SDCL 22–22–31.2 does provide a mechanism for a individual convicted of a sex offense while a juvenile to petition the court for removal from the registry "upon a showing that the person has not been adjudicated or convicted of any sex offense for at least ten years and no longer constitutes a threat to reoffend."

**11.** My proposed holding would be limited to the specific facts of this case and we should express no opinion as to the constitutionality of retroactive application of SDCL 22–22–40 to other offenders convicted prior to the enactment date of the statute.

ments to Meinders for law enforcement purposes. However, the retroactive application of SDCL 22–22–40 to Meinders as it relates to public access is unconstitutional. We should hold that the portion of SDCL 22–22–40 providing for unlimited public access is unconstitutional as it applies to these facts – where the conviction is for statutory rape arising out of a dating relationship, where there was consent, although illegal, giving rise to a crime not shown to likely be repeated, as opposed to child molestation – because it is punitive, not remedial, and such punishment is more burdensome now than when the crime was committed. Therefore, Meinders should be released from the registration requirements of SDCL 22–22–30 through 22–22–39 and SDCL 22–22–40, unless procedures are instituted to limit public access to Meinders' registry information and provide a mechanism for relief from the lifetime registration requirement.

[¶ 61.] We should reverse and remand Issue 1.

[¶ 62.] AMUNDSON, Justice, joins this special writing.